IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CARL STEPHEN MOSELEY,                    )
                                         )
                        Petitioner,      )
                                         )
            v.                           )            1:97CV01239
                                         )
MARVIN POLK[1], Warden,                  )
Central Prison,                          )
Raleigh, North Carolina                  )
                                         )
                        Respondent.      )
_____

MEMORANDUM OPINION

Tilley, District Judge

       This matter is before the Court on Petitioner Carl Stephen Moseley's Petition

for Writ of Habeas Corpus [Doc. # 12] and Amendment to the Petition for Writ of

Habeas Corpus [Doc. # 65] pursuant to 28 U.S.C. § 2254.  For the reasons set

forth below, the Recommendations of the United States Magistrate Judge to deny

habeas relief [Doc. ## 46, 79] are ADOPTED and the habeas petition and amended

habeas petition are DENIED.

                                    I.

       The facts as found by the Magistrate Judge in the initial Recommendation

are adopted and elaborated on when necessary to respond to Petitioner's

objections.  The facts are as follows: Petitioner was convicted of the first-degree

_____

       [1]  Marvin Polk succeeded R.C. Lee as Warden of Central Prison.  The caption
has been amended to accurately reflect this change.

murder of Deborah Henley, a small 38 year-old woman with a split palate and speech impediment. Ms. Henley lived in the Old Town section of Forsyth County and patronized the SRO dance club in Winston-Salem on the evening of July 25, 1991. She was last seen alive in the early morning hours of July 26 leaving the club with Petitioner. Petitioner borrowed a friend's car to purportedly give Ms. Henley a ride home for a $50.00 fee. While driving to another establishment, the friend and a companion eventually encountered Petitioner on the road while driving to return the borrowed car. What should have been a fifteen to thirty minute round trip stretched to over one hour; Petitioner informed them that Ms. Henley lived on the other side of King, North Carolina to justify not having the car back sooner. [2] The following day, Petitioner's friend noticed dirt and weeds in the floorboard of his car that were not previously present.

Petitioner later contacted the friend he borrowed the car from and his companion and requested that they not reveal his presence at the SRO club that evening because it violated terms of his probation. Both testified, however, that they had been to clubs with Petitioner many times before without any such request. When informed that the club's roster would reveal his presence, Petitioner stated that a girlfriend would serve as his alibi.

Ms. Henley's nude body was found partially concealed in a field approximately five miles from the SRO club and within one mile of her home. Ms.

---

[2] Ms. Henley actually lived within a short distance of the SRO Club.

2

Henley's body revealed that she had been beaten, stabbed, strangled, and sexually assaulted with a blunt instrument. A pathologist testified that the cause of death was multiple blunt injuries to the head, face, neck, chest, and abdomen.

Petitioner's residence was searched and his boots were examined. Blood found above the heel of one boot could not be identified. Dirt found on the boots was compared with soil samples taken from the field where Ms. Henley's body was found and there was conflicting expert testimony regarding the results. The State's expert testified that "No two samples that are taken are going to be the same. But the samples were as the same as they could be without actually being taken out of the same bag." (Tr. Vol. IV, p1009)

The State was permitted to introduced evidence of Petitioner's involvement in a previous sexual assault and murder. In April 1991, approximately three and one-half months before Ms. Henley's death, Dorothy Johnson was killed in a similar manner. Ms. Johnson was small and had problems speaking, was last seen alive at the SRO club, was subjected to overkill, and was sexually assaulted with a foreign object. DNA testing revealed that Petitioner's semen was found in Ms. Johnson.[3]

_____

[3] Petitioner was found guilty of the first-degree murder, first-degree sexual assault, and first-degree rape of Ms. Johnson in a separate trial and was sentenced to death. The North Carolina Supreme Court upheld the conviction and sentence on November 3, 1994. State v. Moseley, 338 N.C. 1, 449 S.E.2d 412 (1994). A federal habeas corpus petition has been filed in this case and is currently held in abeyance pending resolution of state collateral review. Moseley v. Polk, 6:97cv00171.

3

Petitioner was convicted of first-degree murder and a capital sentencing proceeding was held pursuant to N.C. Gen. Stat. § 15A-2000.  The jury recommended that Petitioner be sentenced to death based on the following aggravating circumstances: (1) Petitioner had a previous felony conviction involving the use or threat of violence; (2) the capital felony was committed while Petitioner was engaged in the commission of first-degree rape or first-degree sex offense; and (3) the capital felony was especially heinous, atrocious, or cruel.  The only circumstance found to have mitigating value by one or more jurors was Petitioner's cooperative arrest and his assistance to officers in their search of his bedroom.

## II.

The North Carolina Supreme Court affirmed Petitioner's conviction and sentence on July 29, 1994, State v. Moseley, 336 N.C. 710, 445 S.E.2d 906 (1994), and the United States Supreme Court denied Petitioner's petition for a writ of certiorari on January 17, 1995,  Moseley v. North Carolina, 513 U.S. 1120, 115 S. Ct. 923 (1995).  Petitioner filed a motion for appropriate relief ("MAR") in the Superior Court of Forsyth County on April 8, 1996, which was denied four months later on August 7.  On March 6, 1997, the North Carolina Supreme Court denied certiorari review of the denial of Petitioner's MAR.

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on December 2, 1997.  At the same time, he moved in state court to be given

4

discovery pursuant to N.C. Gen. Stat. § 15A-1415(f)[4] in order to prepare a further MAR. The discovery request was initially denied by the Superior Court. On appeal, however, the North Carolina Supreme Court ordered that Petitioner be provided with discovery in light of its decision in <u>State v. Bates</u>, 348 N.C. 29, 497 S.E.2d 276 (1998), which held that the plain, unambiguous language of section 1415(f) mandates that the State produce its "complete files."

On December 16, 1998, the Magistrate Judge issued a Recommendation that Petitioner's federal habeas petition be denied. On December 10, 1999, prior to a ruling on the Recommendation, Petitioner's federal habeas action was held in abeyance pending the resolution of further state collateral review. The Superior Court held an evidentiary hearing on Petitioner's second MAR on October 31, 2000, and denied all claims on March 26, 2001. The North Carolina Supreme Court denied certiorari review on April 8, 2002, and the United States Supreme Court denied certiorari review on October 7, 2002.

Petitioner filed an amendment to his federal habeas petition on March 28, 2002. The Magistrate Judge filed a second Recommendation on March 29, 2004, recommending that Petitioner's amended petition be denied, that the first

---

[4] Section 15A-1415, which was enacted while Petitioner's first MAR was pending, requires that "[i]n the case of a defendant [who is pursuing a MAR and] who has been convicted of a capital offense and sentenced to death, . . . [t]he State, to the extent allowed by law, shall make available to the capital defendant's counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant."

Recommendation be affirmed and adopted, and that this action be dismissed. Petitioner has filed objections to both Recommendations, the State has responded, and this matter is ripe for consideration. Petitioner's habeas corpus claims will be reviewed <u>de novo</u>. Fed. R. Civ. P. 72(b).

III.

Habeas corpus claims that were adjudicated by the state courts on their merits must be reviewed under the deferential standard of review set forth in 28 U.S.C. § 2254(d), part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under section 2254(d), a federal court reviews a state court adjudication to determine whether the decision was contrary to or involved an unreasonable application of clearly established federal law or whether the decision was based on an unreasonable determination of the facts.

A state court decision is "contrary to" federal law if it either arrives at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000). A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407, 120 S. Ct. at 1520. "Unreasonable" is not the

6

same as "incorrect" or "erroneous" and the reasonableness of the state court's decision must be judged from an objective, rather than subjective, standpoint. Id. at 409-10; 120 S. Ct. at 1521-1522. "[T]he criterion of a reasonable determination for purposes of § 2254(d) is not 'whether [the state court decision] is well reasoned,' but 'whether the determination is at least minimally consistent with the facts and circumstances of the case.'" Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000) (citing Wright v. Angelone, 151 F.3d 149, 157 (4th Cir. 1998)). As for questions of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

IV.

Petitioner objects to the Magistrate Judge's Recommendations regarding all claims raised in the habeas corpus petition and amended petition, which include the following: (1) due process violation by the State for withholding exculpatory evidence; (2) due process violation by the State's improper closing argument implicating Petitioner's right not to testify; (3) ineffective assistance of counsel; (4) due process violation by the trial court for improperly defining "reasonable doubt" during jury instructions; (5) due process violation by the trial court for failing to instruct the jury on the lesser-included offense of second-degree murder; and (6) due process violation by the trial court's vague and over broad jury instruction on the "heinous, atrocious or cruel" aggravating factor. Each claim will be addressed

7

separately.[5]

A.

Petitioner first contends that the State violated his due process rights by failing to disclose the following exculpatory evidence prior to trial: (1) information concerning other potential suspects in the Dorothy Johnson murder investigation; (2) contrary testimony concerning an alleged inculpatory statement made by Petitioner regarding the location where Dorothy Johnson's body was found; (3) information concerning an alleged financial reward from Crime Stoppers received by an informant in the Dorothy Johnson case; (4) hair comparisons of black or dark hairs recovered from underneath the fingernails of both Deborah Henley and Dorothy Johnson; (5) the SRO club sign-in sheets for the night of Deborah Henley's murder; and (6) Petitioner's statements regarding a past assault submitted as an aggravating factor in this case.

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1197-

---

[5] Petitioner also claims that Petitioner's indictment was unconstitutional for failing to charge the elements of first-degree murder and the aggravating factors relied upon at sentencing. Petitioner acknowledges, however, that Fourth Circuit precedent requires a ruling against him. See Daniels v. Lee, 316 F.3d 477 (4th Cir. 2003). Because this claim was filed solely for preservation purposes, it will not be discussed further in this opinion.

8

98 (1963).  Both impeachment evidence and exculpatory evidence "fall[ ] within the Brady rule."  United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375 (1985).  Moreover, the prosecution "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995).

A Brady violation contains three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material (i.e., prejudicial to the defense).  Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936 (1999); McHone v. Polk, 392 F.3d 691, 719 (4th Cir. 2004).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Kyles, 514 U.S. at 433-34, 115 S. Ct. at 1565.  A "reasonable probability" of a different result is shown when the suppression of the evidence "undermines confidence in the outcome of the trial."  Id. at 434, 115 S. Ct. at 1566.  In determining materiality, a court must view the suppressed evidence collectively rather than item by item, id. at 436, 115 S. Ct. 1555, and consider its cumulative effect on both the jury and defense counsel's preparation or presentation, Bagley, 473 U.S. at 683, 105 S. Ct. at 3384.

In the context of a capital sentencing proceeding, a demonstration of prejudice requires a showing that "there is a reasonable probability that, absent

9

[the government's suppression of evidence], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Strickland v. Washington</u>, 466 U.S. 668, 695, 104 S. Ct. 2052, 2068-69 (1984); <u>see also</u> <u>United States v. Hughes</u>, 401 F.3d 540, 554 n.12 (4th Cir. 2005) (noting that the ineffective assistance of counsel prejudice standard was adopted for failure to disclose evidence claims under <u>Brady</u>). To make such a showing, a petitioner need not establish a reasonable probability that the entire jury would have voted against the imposition of the death sentence, rather that "there is a reasonable probability that at least one juror would have struck a different balance." <u>Wiggins v. Smith</u>, 539 U.S. 510, 537, 123 S. Ct. 2527, 2543 (2003). In determining whether a petitioner has carried his burden of showing that there is a reasonable probability that at least one juror would have declined to impose a death sentence if presented with certain suppressed evidence, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." <u>Id.</u> at 534, 123 S. Ct. at 2542.

1.

During Petitioner's trial for the murder of Deborah Henley, the prosecution presented a substantial amount of evidence related to the murder of Dorothy Johnson and made repeated references to Ms. Johnson's murder in both its guilt and sentencing phase closing arguments. Defense counsel attempted to rebut the State's Johnson evidence with general arguments that the presence of Petitioner's

10

semen in the Johnson case was the result of a consensual sexual encounter and that an unknown party subsequently committed the murder.

The State did not disclose to the defense significant information concerning the murder investigation of Dorothy Johnson that centered around two of Ms. Johnson's ex-boyfriends, Daniel Cannaday and Dexter Mabe. The withheld evidence, along with the evidence that would have reasonably been uncovered in the subsequent defense investigation, consisted of the following:

(1) A letter written by Dorothy Johnson to Daniel Cannaday the day before her death. In the letter, Ms. Johnson expressed her positive feeling towards Mr. Cannaday and recounted a recent conversation in which he expressed his love and desire to marry her. Ms. Johnson informed Mr. Cannaday that she was seeing other men and mentioned potentially getting together that weekend. Ms. Johnson further noted that Dexter Mabe had threatened to kill her after they broke up and that he would kill her if he learns of her contemptuous feeling towards him. (Am. Habeas Pet., Ex. 9);

(2) A police interview with Dorothy Johnson's friend and co-worker, Debra Wells. Ms. Wells indicated that Daniel Cannaday telephoned Ms. Johnson at work on the Friday before her death and that Ms. Johnson was hesitant to speak with him. Ms. Wells, who was also at the SRO club on the night of Ms. Johnson's murder, witnessed Ms. Johnson dance with several people throughout the evening. (Am. Habeas Pet., Exs. 10A, 10B);

11

(3)  A written statement by Shannon Hill, an SRO club patron on the night of Dorothy Johnson's death.  Ms. Hill indicated that see saw Ms. Johnson slow dancing "Lovey Dovey" with a man she later identified in a photographic lineup as Mr. Cannaday.  (Am. Habeas Pet., Exs. 5A, 5B);

(4)  A police interview with Edward Moore, an off-duty deputy sheriff who was providing security at the SRO club on the night of Dorothy Johnson's murder. Mr. Moore stated that he witnessed Ms. Johnson leaving the club at closing time with a male companion, who he later identified as Daniel Cannaday in a photographic lineup.  (Am. Habeas Pet., Exs. 4A, 4B, 4C);[6]

(5)  Police interviews with Daniel Cannaday.  Mr. Cannaday explained that his romantic relationship with Dorothy Johnson ended because of her mood swings; he stated that Ms. Johnson went from "a loveable mood" to "curs[ing] him out and be[ing] very harsh" when she was not taking her prescription medication. Mr. Cannaday claimed to have called Ms. Johnson earlier in the week of her death because of his belief that she had recently called his father claiming to be pregnant with his child.  Ms. Johnson denied making such a call and informed Mr. Cannaday that she was dating someone else.  Other than the above mentioned call and the letter Ms. Johnson sent two weeks before her death, Cannaday claimed not to

---

[6]  In addition to providing statements to law enforcement shortly after Ms. Johnson's murder, Mr. Moore later testified at the state court evidentiary hearing that he saw only a portion of the man's face who left with Ms. Johnson that night and that there was an "uncanny" resemblance between a picture he had recently seen of Petitioner and Mr. Cannaday's photograph lineup picture.

12

have had contact with Ms. Johnson for over two months; he specifically denied calling her on the day she was killed. Further, Mr. Cannaday claimed to have spent the entire night with Sue Gauldin (also referred to in the record as Sue Peck and now Sue Dillon), denied ever patronizing the SRO club, and voiced his suspicion of Dexter Mabe. (Am. Habeas Pet., Exs. 6A, 6B, 6C, 6D);

(6) Testimony of Sue Dillon. While Ms. Dillon was never interviewed by law enforcement during the Johnson murder investigation, she did testify during the 2000 state evidentiary hearing that she did not spend the entire night with Daniel Cannaday on the night of Ms. Johnson's death. Instead, she testified that she dropped Mr. Cannaday off at his father's house in Martinsville, Virginia between 9:00 and 10:00 that evening. Mr. Cannaday had access to his father's car, who lived approximately one-hour and fifteen minutes from the SRO club in Winston-Salem;

(7) Police interviews with Donald Lane and Allen Forrest, security officers at the SRO club on the night of Ms. Johnson's death. They witnessed Ms. Johnson talking and dancing that evening, but could not identify with whom. Both Mr. Lane and Mr. Forrest viewed a photographic lineup and recognized Daniel Cannaday as an SRO club patron. (Am. Habeas Pet., Exs. 11, 12);

(8) A police interview with a confidential source. The confidential source recounted rumors that a Reidsville motorcycle gang was involved in Dorothy Johnson's death and stated that he had seen Daniel Cannaday at the SRO club on

13

at least one prior occasion. (Am. Habeas Pet., Ex. 13);

(9) A police interview with Margaret Sisk, a waitress at a restaurant frequented by Dorothy Johnson and Daniel Cannaday. Ms. Sisk stated that Mr. Cannaday asked the wait staff whether Ms. Johnson came in with other men; he provided his name and telephone number and asked to be informed if she ever did. (Am. Habeas Pet., Ex. 7);

(10) A police interview with Shirley Jones, a close friend and co-worker of Dorothy Johnson. Ms. Jones discussed how Daniel Cannaday was possessive of Ms. Johnson and how Dexter Mabe had threatened Ms. Johnson on more than one occasion. Ms. Jones stated that Ms. Johnson was also afraid of a man who was going to obtain a handwriting analysis from her regarding the proceeds of a life insurance policy; after he had physically assaulted her, Ms. Johnson contacted the police and she was concerned that he may seek revenge. (Am. Habeas Pet., Exs. 8A, 8B);

(11) Police records for Dexter Mabe, which show multiple charges for angry or assaultive behavior. (Am. Habeas Pet., Exs. 19A, 19B, 19C, 19D);

(12) A police interview with Dexter Mabe. Mr. Mabe admitted that he and Dorothy Johnson argued and got into an altercation at the SRO club on the evening of her death. Mr. Mabe further stated that he and his girlfriend, Sherry Hoss, departed the SRO club at approximately midnight and spent the entire evening together. (Am. Habeas Pet., Exs. 17A, 17B);

14

(13)  A police interview and evidentiary hearing testimony of Sherry Hoss. Ms. Hoss was with Dexter Mabe at the SRO club the evening of Dorothy Johnson's death.  Ms. Hoss confirmed that she and Mr. Mabe left the club between 11:30 and midnight and spent the entire night together.  Ms. Hoss further testified that she did not see Daniel Cannaday at the club that evening.  (Am. Habeas Pet., Exs. 16A, 16B, 16C, 16D);

(14)  A police interview of Rose Inmann, a patron of the SRO club the night of Dorothy Johnson's death.  Ms. Inmann stated that she witnessed Dexter Mabe and Sherry Hoss leave the SRO club between 11:00 and 11:30 that evening and that approximately one hour later she saw Mr. Mabe dancing with Ms. Johnson. (Am. Habeas Pet., Exs. 18A, 18B, 18C, 18D); and

(15)  A police interview of Mark Lamb, a patron of the SRO club the night of Dorothy Johnson's death.  Mr. Lamb witnessed Ms. Johnson arguing with Dexter Mabe, who believed that Ms. Johnson was interfering with his relationship with Sherry Hoss.  (Am. Habeas Pet., Exs. 15A, 15B).

Because the suppressed evidence is clearly favorable to Petitioner, the sole remaining issue for consideration in this claim is the materiality of that evidence. Defense counsel's efforts to identify and present credible, alternative suspects in the Johnson murder were severely inhibited without the information outlined above.  Petitioner argues that the Johnson evidence played a critical role in his conviction for the murder of Deborah Henley and that there is a reasonable

15

probability that the outcome of the guilt and/or sentencing phases of trial would have been different had he been able to credibly counter the State's portrayal of him as a habitual murderer by presenting evidence concerning Daniel Cannaday and Dexter Mabe.

First, any increased doubt caused by the suppressed information with regard to Petitioner's culpability in the murder of Dorothy Johnson is significantly outweighed by the strong evidence of Petitioner's guilt in the murder of Deborah Henley. Petitioner borrowed a friend's car to purportedly give Ms. Henley a ride home from the SRO club on the evening of her murder and was the last person seen with her. It took Petitioner significantly longer than expected to return with the borrowed car, he made false statements about where Ms. Henley lived to justify his extended absence, and he asked friends to lie about his presence at the SRO club that evening. Petitioner returned the car with dirt and weeds in the floorboard that were not present before. Police searched Petitioner's bedroom and found soil and traces of blood on his boots; there was conflicting expert testimony regarding the source of the soil and the blood could not be identified. It is not reasonably probable that the jury would have second guessed its guilt determination in the Henley case based simply on possible alternative suspects in the Johnson case who had no ties with or motive to harm Deborah Henley.

Second, even if the suppressed information regarding the potential alternative suspects in Ms. Johnson's murder had been disclosed, it is not

16

reasonably probable that at least one juror would have declined to impose the death penalty for the murder of Ms. Henley. During the sentencing phase of trial, the following mitigating circumstances were submitted for the jury's consideration: (1) Petitioner's age at the time of Ms. Henley's murder; (2) whether Petitioner is considerate and loving to his mother, father, and sister; (3) whether Petitioner is a loving father to his son; (4) whether Petitioner has been a productive member of society based on his education and work history; (5) whether Petitioner has sought to exert a good religious influence on his son; (6) whether Petitioner was cooperative during his arrest and assisted police during the search of his bedroom; (7) whether the offense was out of character for Petitioner; and (8) the "catchall" (i.e., whether any other circumstances arising from the evidence has mitigating value).

The only submitted mitigating circumstances that would have potentially been affected by the suppressed information concerning the murder of Ms. Johnson were whether the offense was out of character for Petitioner and the "catchall." However, any doubt raised as to whether the sexual assault and murder of Ms. Henley was an aberration of Petitioner's character or whether Petitioner was also involved in the death of Ms. Johnson is significantly outweighed by the unanimous aggravating circumstances found by the jury: (1) Petitioner had a previous felony conviction involving the use or threat of violence; (2) the capital felony was committed while Petitioner was engaged in the

17

commission of first-degree rape or first-degree sex offense; and (3) the capital felony was especially heinous, atrocious, or cruel.  In fact, it is difficult to even imagine a redeeming quality or circumstance that could tip the scales in favor of a life sentence considering the brutal nature of this crime.

The state court's conclusion that there was not a reasonable probability of a different outcome was neither contrary to nor an unreasonable application of established Supreme Court precedent.  This claim is, therefore, DENIED.

2.

In addition to the evidence concerning Daniel Cannaday and Dexter Mabe, Petitioner contends that the State further withheld the following evidence concerning the murder of Dorothy Johnson: (1) Pamela James' statement refuting Sonja Nance's testimony that Petitioner once referred to her property, where Dorothy Johnson's body was found, as a good place to leave a body; and (2) information concerning an alleged financial reward from Crime Stoppers received by an informant in the Dorothy Johnson case.  Petitioner argues that Nance's testimony was the State's only direct evidence of premeditation and deliberation, and that but for that testimony the jury may have found either that Petitioner was not guilty or that he acted in a drunken rage.  Petitioner further argues that any financial award received by a witness is important impeachment material that must be disclosed.

For the reasons discussed above, there is no reasonable probability that the

18

outcome of this case would have been different had all evidence relating solely to the murder of Dorothy Johnson been disclosed and introduced at trial. Any doubt raised concerning Petitioner's involvement in the murder of Ms. Johnson is of minimal evidentiary value considering the strong evidence of Petitioner's guilt in the murder of Deborah Henley and the brutal nature of the crime. As such, these claims are DENIED.

3.

A black or dark hair was found under the fingernails of both Deborah Henley and Dorothy Johnson. (Trial Tr. at 1383-85.) Petitioner argues that it is "highly likely" that the North Carolina State Bureau of Investigation ("SBI") made comparisons of the dark hairs found on both victims and that the State suppressed the results. During guilt phase closing arguments, defense counsel made the following argument concerning a possible alternate suspect:

> [T]hose black hairs did not match respectively Miss Henley or Miss Johnson, and did not match the defendant Carl Moseley . . . . [T]he man who killed these two women are out there walking around with black hair while this man is on trial for suspicion . . . . [T]here is absolutely no evidence offered by the State of North Carolina that those two black hairs don't match each other. They have given you no other explanation for those two hairs. There are two black hairs on two separate victims. But we don't test them and compare them. Because that doesn't fit our conclusion, we tested to make sure they weren't Moseley's. Once we did, we dismissed it like everything else we dismiss. And you can't get around those two black hairs. They were there.

(Trial Tr. at 1542-44.) The State contends that no comparisons were made and

19

that the hairs are not inconsistent with Petitioner's guilt.

Petitioner cannot establish that the State withheld any material, exculpatory evidence. There is no proof that the SBI made the claimed hair comparisons, much less that any results were favorable to Petitioner. Further, as noted by the Magistrate Judge in the initial Recommendation:

> Petitioner speculates that the hair sample comparison was material because the color of the hair did not match either [P]etitioner's or the victim's. However, there is no evidence in the record to indicate that neither [P]etitioner nor the victim did not have the color of hair found in the victim's fingernail on any part of their bodies.

(Recommendation I at 6 n.1.) A Brady violation may not be premised on mere speculation. See Wood v. Bartholomew, 516 U.S. 1, 6-8, 116 S. Ct. 7, 10-11 (1995). Therefore, this claim is DENIED.

4.

Petitioner argues that the State also failed to produce the SRO club sign-in sheets for the night of Deborah Henley's murder, which allegedly denied him an opportunity to identify other potential suspects by comparing them with the sign-in sheets from the night of Dorothy Johnson's murder. Even assuming that there were other individuals who were present at the SRO club on both nights, there is not a reasonable probability that the outcome would have been different had the guest lists been disclosed. The inferential leap that another man who was present at the SRO club on both April 12 and July 25, 1991 killed Ms. Johnson after she had consensual sex with Petitioner and then later killed Ms. Henley after Petitioner

20

gave her a ride home and made false statements about where she lived cannot be made. This claim is DENIED.

5.

Petitioner had previously been convicted of assault with a deadly weapon inflicting serious injury and attempted second-degree rape. Moseley, 336 N.C. at 719-20, 445 S.E.2d at 911. The victim, Laura Denise Fletcher, recounted the details of the crime during the sentencing phase of trial and the jury found the aggravating factor that Petitioner had a previous felony conviction involving the use or threat of violence. Petitioner argues, however, that previous statements he made to both law enforcement and Ms. Fletcher concerning those crimes were withheld from the defense.

During the investigation of that crime, the police recorded a conversation between Petitioner and Ms. Fletcher where Petitioner apologized and stated that he drank a fifth of liquor on the evening of the assault, that he had no recollection of assaulting her, and that he experienced alcohol induce blackouts in the past. The police later took Petitioner's statement where he denied assaulting Ms. Fletcher but admitted drinking a large amount of alcohol. Petitioner concedes that these statements are insufficient to demonstrate actual innocence, but argues that they lessen his culpability and mitigate his conduct.

Had the State disclosed Petitioner's statements concerning his assault of Ms. Fletcher, it is not reasonably probable that any juror would have decided not to

21

find the assault as an aggravating factor based on Petitioner's blackout excuse. Further, the balance of aggravating and mitigating circumstances would not have been affected. This claim is, therefore, DENIED.

B.

Petitioner next contends that the State violated his due process rights by improperly commenting on his right not to testify. The Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233 (1965). "The test for determining whether an indirect remark constitutes an improper comment on a defendant's failure to testify is: 'Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" United States v. Whitehead, 618 F.2d 523, 527 (4th Cir. 1980) (quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973)).

Prior to making the statements at issue in this claim, the prosecutor argued that Petitioner was the last person seen with Ms. Henley on the night of her murder, that Petitioner's travel time was over twice as long as expected, and that Petitioner returned the borrowed car with debris on the floorboard. (Trial Tr. at 1561-62.) The prosecutor then discussed the defense hiring Darryl Wilson, a private investigator with 22 years of police experience who worked 70 to 75 hours on this case, and stated:

22

> And don't you know that the first thing [Mr. Wilson] did was say that
> - - to the defendant when did you take her? Let me go get a witness
> that saw her get out of your car.  Don't you know that was the first
> thing he did?  And of course, you know that whatever the defendant
> told him led him on a wild goose chase.  Because no witness came
> forward and said I saw her.

(Trial Tr. at 1562.)  The prosecutor concluded that there were no witnesses

because no witnesses existed.

There was no manifest intent by the prosecution to comment on Petitioner's

failure to testify.  Viewed in context, the argument at issue amounts only to an

assertion by the prosecution that despite the significant time devoted to this case

by an experienced investigator, Petitioner was the last person to see Ms. Henley

alive.  Simply suggesting that evidence is uncontradicted does not rise to "such

character that the jury would naturally and necessarily take it to be a comment on

the failure of the accused to testify."  United States v. Francis, 82 F.3d 77, 78

(4th Cir. 1996); see also United States v. Percy, 765 F.2d 1199, 1204-05 (4th

Cir. 1985) (finding no error in the government's reference to the "unrefuted and

unrebutted" testimony presented at trial).

This claim is without merit and is, therefore, DENIED.

### C.

Petitioner next contends that defense counsel provided constitutionally

ineffective assistance by: (1) failing to investigate, discover, and introduce

exculpatory evidence implicating Daniel Cannaday and Dexter Mabe in the murder

23

of Dorothy Johnson; (2) failing to interview and present the testimony of Pamela James; (3) failing to investigate and present evidence that the SRO club was known as a meeting place for casual sex; (4) failing to request funds for a pathologist to assist the defense; (5) failing to obtain independent forensic comparison of the dark or black hairs found on both Deborah Henley and Dorothy Johnson; and (6) failing to object to or appeal from the State's improper reference to Petitioner's right not to testify.

"It has long been recognized that the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984). To establish an ineffective assistance of counsel claim, a "[petitioner] must show that counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms." Id. at 688, 104 S. Ct. at 2065. A claim that counsel's assistance was so defective as to require habeas relief from a conviction or death sentence has two components:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This

24

requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was not reliable.

Id. at 687, 104 S. Ct. at 2064.

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689, 104 S. Ct. at 2065. Therefore, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range a reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. "Indeed, it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding, because virtually every act or omission of counsel would meet this test." Williams, 529 U.S. at 394, 120 S. Ct. at 1514; see also Strickland, 466 U.S. at 693, 104 S. Ct. at 2067-68. "The petitioner bears the 'highly demanding' and 'heavy burden' in establishing actual prejudice."

25

Williams, 529 U.S. at 394, 120 S. Ct. at 1514.

### 1.

Petitioner claims that defense counsel were ineffective for failing to investigate and present evidence concerning: (1) Daniel Cannaday and Dexter Mabe as alternative suspects in the murder of Dorothy Johnson; (2) Pamela James' statement refuting Sonja Nance's testimony that Petitioner referred to the property where Dorothy Johnson's body was found as a good place to leave a body; and (3) the SRO club's reputation as a meeting place for casual sex to support the contention that Petitioner had consensual sex with Dorothy Johnson before her murder. As discussed above, information relating solely to the death of Ms. Johnson does not create a reasonable probability of a different outcome. See Hughes, 401 F.3d at 554 n.12 (noting that the prejudice standard is this same under Brady and Strickland). Because Petitioner cannot establish the requisite showing of prejudice, these claims are DENIED.

### 2.

Petitioner claims that defense counsel were ineffective for failing to seek funds to secure the assistance of an independent pathologist. The State presented the testimony of two pathologists during trial. Dr. Gregory Davis testified about Deborah Henley's cause of death and her multiple injuries, some of which he characterized as consistent with torture. (Trial Tr. at 560-66.) Dr. Davis examined two knives belonging to Petitioner and testified that they were consistent with the

26

size and shape of Ms. Henley's stab wounds.  (Trial Tr. at 601.)

Dr. Patrick Lantz testified, among other things, about Deborah Henley's stomach contents; there was evidence that Ms. Henley ate eggs and tomato at some point before her death.  (Trial Tr. at 1391-92.)  Dr. Lantz testified that there was a large variance in the digestive process depending on an individual's physiology, food intake, and other considerations such as severe stress and anxiety.  (Trial Tr. at 1387.)  Dr. Lantz considered stomach contents to be of minimal value in estimating post-mortem interval and he was unable to estimate the maximum time prior to Ms. Henley's death that she could have eaten the partially digested food in her stomach.  (Trial Tr. at 1389, 1391-92.)

Petitioner contends that the assistance of an independent pathologist was necessary to establish that Ms. Henley's stomach contents were inconsistent with the State's theory of the sequence and timing of events.  He argues that "[i]f it could have been shown that the victim had to have eaten her last meal within less than six hours of her death, then it would have been impossible for petitioner to have committed the crime."  (Br. in Support of Habeas Pet. at 41-42.)  Petitioner further argues that a pathologist was necessary to challenge the testimony that his knives were consistent with the size and shape of Ms. Henley's wounds.

In the course of habeas review of an ineffective assistance of counsel claim, it is often most efficient to review the prejudice prong of the Strickland test first. If Petitioner cannot show prejudice from defense counsels' alleged errors, the

ineffective assistance claim cannot prevail whether or not counsels' performance was deficient in some respect. Considering the strong evidence of guilt in this case, it is not reasonably probable that the outcome would have been different had defense counsel offered speculative testimony concerning Ms. Henley's food digestion and time of death. Exhibits filed by Petitioner in support of his MAR corroborate Dr. Lantz's testimony concerning digestive variances. Further, any evidence rebutting Dr. Davis' testimony concerning Ms. Henley's wounds and the consistent shape of Petitioner's knives would have done little to overcome the overwhelming circumstantial evidence of Petitioner's guilt. Accordingly, this claim is DENIED.

## 3.

Next, Petitioner argues that defense counsel were ineffective for failing to secure independent laboratory testing of the dark or black hairs found under the fingernails of both Deborah Henley and Dorothy Johnson. Petitioner, however, has merely shown that forensic testing of the hairs could potentially point to a credible alternate suspect in both murders. As such, he has failed to meet the "highly demanding" and "heavy burden" of establishing actual prejudice. This claim is, therefore, DENIED.

## 4.

Petitioner claims that defense counsel were ineffective for failing to object to or appeal from what he construed as an improper reference to Petitioner's right not

28

to testify in the State's closing argument. However, as discussed above, the challenged argument made by the State was not of "such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." See Whitehead, 618 F.3d at 527. This claim is, therefore, DENIED.

D.

Petitioner next contends that the trial court's jury instruction regarding "reasonable doubt" relieved the State of its burden of proof in violation of due process. Due process protects an accused "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). While the Constitution requires that juries be instructed on the necessity that the defendant's guilt be proven beyond a reasonable doubt, it "neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243 (1994). When a trial court elects to define reasonable doubt, the Constitution does not mandate a particular definition. Id. The Supreme Court has made clear that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400 (1973). "[T]he proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether

29

there is a reasonable likelihood that the jury did so apply it." <u>Victor</u>, 511 U.S. at 6,

114 S. Ct. at 1243 (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 n.4, 112 S. Ct.

475, 482 n.4 (1991)).

In this case, the trial court defined "reasonable doubt" as follows:

A reasonable doubt is a doubt based on reason and common sense arising out of some or all of the evidence that has been presented or the lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

Defined another way, a reasonable doubt is not a vain, imaginary, or fanciful doubt; but is a sane, rational doubt. When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be <u>fully satisfied or entirely convinced or satisfied to a moral certainty</u>. If after considering and comparing and weighing all the evidence the minds of the jurors are left in such condition that they cannot say they have an <u>abiding faith to a moral certainty in the defendant's guilt</u>, then they have a reasonable doubt. Otherwise, not.

A reasonable doubt, as that term is employed in the administration of the criminal law, is an honest <u>substantial misgiving generated by the insufficiency of the proof</u>; an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused. It is not to [sic] the doubt suggested by the ingenuity of counsel or by your own ingenuity not legitimately warranted by the testimony. Nor is it one borne of merciful inclination or disposition to permit the defendant to escape the penalty of the law. Nor is it one prompted by sympathy for him or those connected with him.

(Trial Tr. at 1579-81) (emphasis added.) Petitioner specifically objects to the trial

court's use of the phrases "moral certainty" and "substantial misgiving."

In <u>Cage v. Louisiana</u>, 498 U.S. 39, 111 S. Ct. 328 (1990), the Supreme

Court held that a reasonable doubt instruction violated due process because, when

read "as a whole," it "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty." In <u>Victor v. Nebraska</u>, 511 U.S. 1, 114 S. Ct. 1239 (1994), however, the Supreme Court upheld a reasonable doubt jury instruction similar to the one found to be defective in <u>Cage</u>. The Supreme Court concluded that based on the context of the instructions, the phrases "substantial doubt" and "moral certainty" did not impermissibly lower the government's burden of proof. <u>Victor</u>, 511 U.S. at 22-23, 114 S. Ct. at 1251 ("There [was] no reasonable likelihood that the jurors who determined petitioners' guilt applied the instructions in a way that violated the Constitution.").

The North Carolina Supreme Court held, pursuant to <u>Victor</u>, that "use of the terms 'fully satisfied or entirely convinced' and 'abiding faith' in conjunction with 'moral certainty' made it clear to the jury that the State's burden of proof was not less than the constitutional standard." <u>Moseley</u>, 336 N.C. at 717, 445 S.E.2d at 910. The court further held that "use of the term 'substantial misgiving' alone does not" render the instruction unconstitutional, as distinguished from the complimentary uses of "substantial doubt" and "grave uncertainty" in <u>Cage</u>. <u>Id.</u> Further, "the [trial] court in this case made it clear that in determining whether they were convinced beyond a reasonable doubt, the jurors must consider all the evidence." <u>Moseley</u>, 336 N.C. at 717, 445 S.E.2d at 910.

Taken as a whole, the reasonable doubt instruction given by the trial court

31

did not impermissibly lower the State's burden of proof.  The North Carolina

Supreme Court's well reasoned denial of Petitioner's due process claim was neither

contrary to nor an unreasonable application of established Supreme Court

precedent.  This claim is, therefore, DENIED.

E.

Next, Petitioner contends that the trial court violated his rights to due

process by failing to instruct the jury on the lesser-included offense of second-

degree murder.  A capital defendant has the due process right to receive a lesser-

included offense jury instruction "when the evidence unquestionably establishes

that the defendant is guilty of a serious, violent offense - but leaves some doubt

with respect to an element that would justify conviction of a capital offense . . . ."

Beck v. Alabama, 447 U.S. 625, 637-38, 100 S. Ct. 2382, 2389 (1980).  "But

'[a] defendant is not entitled to have the jury instructed as to lesser degrees of the

crime simply because the crime charged is murder.'" Bates v. Lee, 308 F.3d 411,

418 (4th Cir. 2002) (quoting Briley v. Bass, 742 F.2d 155, 164 (4th Cir. 1984)).

Rather, "due process requires that a lesser included offense instruction be given

only when the evidence warrants such an instruction."  Hopper v. Evans, 456 U.S.

605, 611, 102 S. Ct. 2049, 2053 (1982) (emphasis in original).  The focus,

therefore, is on whether there is sufficient evidence to support a lesser-included

offense, not on whether "the evidence is sufficient to prove the greater one."  See

Hooks v. Ward, 184 F.3d 1206, 1232 (10th Cir. 1999).

32

"'The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge.'" Bates, 308 F.3d at 418 (quoting United States v. Chapman, 615 F.2d 1294 (10th Cir. 1980)). Furthermore, "'[w]here . . . the highest court of a state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of state law. Accordingly, the circumstances that induce a federal court to overturn the state court determination would need to be extraordinary, indeed.'" Id. (quoting Bagby v. Sowders, 894 F.2d 792, 795 (6th Cir. 1990)).

There are three degrees of homicide under North Carolina law, only two of which are relevant to this case. First-degree murder is the "unlawful killing of another human being with malice and with premeditation and deliberation." State v. Bonney, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991); N.C. Gen. Stat. § 14-17. Second-degree murder is "the unlawful killing of another human being with malice but without premeditation and deliberation." State v. Thibodeaux, 352 N.C. 570, 582, 532 S.E.2d 797, 806 (2000). "Premeditation means that the act was thought out beforehand for some period of time, however short, but no particular amount of time is necessary for the mental process of premeditation." State v. Connor, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed

33

design for revenge or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by a lawful or just cause of provocation." Id. at 635, 440 S.E.2d at 836.

Following the close of evidence in this case, the trial court excused the jury and conducted a charge conference. Defense counsel requested jury instructions on second-degree murder and voluntary manslaughter but pointed to no evidence in support of the request. (Trial Tr. at 1506.) The trial court found that "the evidence here in this record belies anything other than the premeditated and deliberate killing. To suggest that the murderer here did not act with premeditation and deliberation on the evidence as has been presented would be to invite a total disregard of the facts by the jury." (Trial Tr. at 1509.) On direct appeal, the North Carolina Supreme Court found that Petitioner offered only evidence that he did not commit the offense, which is "not sufficient to submit the charge of second-degree murder to the jury." Moseley, 336 N.C. at 723, 445 S.E.2d at 913-14.

Petitioner argues in his habeas petition that "some evidence was admitted which arguably tended to show that the murder of Deborah Johnson was not done with premeditation and deliberation, but in a state of severe intoxication and/or rage." (Habeas Pet. at 29) (emphasis added.) Petitioner seems to have mistakenly combined the names of Deborah Henley and Dorothy Johnson. First, the circumstances surrounding the murder of Ms. Johnson are irrelevant as to the proper jury instructions in this case. Second, Petitioner fails to cite any evidence

34

to support a finding that intoxication or rage played a part in the Henley murder, much less the extraordinary evidence necessary to overturn the state court's contrary determination. There was simply insufficient evidence to support a lesser-included offense jury instruction.

The North Carolina Supreme Court's finding of insufficient evidence to support a lesser-included offense jury instruction was neither contrary to nor an unreasonable application of established Supreme Court precedent. Accordingly, this claim is DENIED.

F.

Finally, Petitioner contends that his due process rights were violated by the trial court's vague and over broad jury instruction on the "heinous, atrocious or cruel" aggravating factor. The Eight Amendment imposes the duty on the states to individualize capital sentencing proceedings in order to eliminate "the arbitrary and capricious infliction of the death penalty." Godfrey v. Georgia, 446 U.S. 420, 428, 100 S. Ct. 1759, 1764 (1980). "[T]he Supreme Court has 'insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.'" Fisher v. Lee, 215 F.3d 438, 457 (4th Cir. 2000) (quoting Maynard v. Cartwright, 486 U.S. 356, 362, 108 S. Ct. 1853, 1858 (1988)). In reviewing a state court's application of a statutory aggravating circumstance, it must be determined "whether the statutory language defining the

35

circumstance is itself too vague to provide guidance to the sentencer." Id. (internal

citation omitted).  If so, it must then be determined "whether the state courts have

further defined the vague terms and, if they have done so, whether those

definitions are constitutionally sufficient, i.e., whether they provide some guidance

to the sentencer." Id. (emphasis in original).

In this case, the trial court instructed the jury on the "heinous, atrocious or

cruel" aggravating factor as follows:

> In this context, members of the jury, heinous means extremely
> wicked or shockingly evil.  Atrocious means outrageously wicked and
> vile.  And cruel means designed to inflict a high degree of pain with
> utter indifference to or even enjoyment of the suffering of others.

> However, it is not enough that this murder be heinous,
> atrocious, or cruel as those terms have just been defined.  This murder
> must have been especially heinous, atrocious or cruel, and not every
> murder is especially so.

> Now, members of the jury, for this murder to have been
> especially heinous, atrocious or cruel, any brutality which was
> involved in it must have exceeded that which is normally present in
> any killing.  Or this murder must have been a conscienceless or pitiless
> crime which was unnecessarily tortuous to the victim.

(Trial Tr. at 1700-01) (quoting N.C. Pattern Jury Instructions.)

The Fourth Circuit has specifically held that the North Carolina limiting

instruction for the "heinous, atrocious or cruel" aggravating factor used in this

case: (1) defines the individual terms of the aggravating circumstance; (2)

emphasizes that not every murder is especially heinous, atrocious, or cruel; and (3)

requires the jury to find that the murder involved greater than normal brutality, or

that the murder was a conscienceless or pitiless crime that was unnecessarily torturous to the victim.  Fisher, 215 F.3d at 459; see also Frye v. Lee, 235 F.3d 897, 907-08 (4th Cir. 2000).  As such, the limiting instruction requires "the jury to make additional findings in order to distinguish [a given] murder from all others and, therefore, provide[s] the meaningful guidance required to ensure that [a] death sentence was not imposed in an arbitrary or capricious manner."  Fisher, 215 F.3d at 459.

Further, the application of the "heinous, atrocious or cruel" aggravating factor in this case was not unreasonable.  The brutality involved in this case is easily distinguishable from other, less torturous murders.  As found by the North Carolina Supreme Court, "Deborah Henley was sexually assaulted with a blunt object, was beaten about the head, face, neck, chest, and abdomen, . . . was stabbed twelve times, . . . was tortured by means of two long incisions on her chest and two more across her neck, . . . [and] was manually strangled."  Moseley, 336 N.C. at 723, 445 S.E.2d at 913.

Petitioner's claim is without merit and is, therefore, DENIED.

V.

 For the reasons set forth above, the Recommendations of the United States Magistrate Judge to deny habeas relief [Doc. ## 46, 79] are ADOPTED and the habeas petition [Doc. # 12 ] and amendment to the habeas petition [Doc. # 65] are DENIED.

37

This the day of October 27, 2006

   /s/ N. Carlton Tilley, Jr.
United States District Judge